UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Walter Aston,

      Plaintiff,

v.                                                          Case No. 12-14467

Tapco International Corporation, *et al.*,          Sean F. Cox
                                                           United States District Court Judge
      Defendants.

_____/

## OPINION & ORDER

Plaintiff filed this employment discrimination action against his former employer, and several of its managers, asserting claims under the federal Americans with Disabilities Act ("ADA"), Michigan's Persons with Disabilities Civil Rights Act ("PWDCRA"), and the federal Family Medical Leave Act ("FMLA"). The matter is currently before the Court on Defendants' Motion for Summary Judgment and Plaintiff's Motion for Partial Summary Judgment as to his ADA Claims. The parties have fully briefed the issues and the Court heard oral argument.

As set forth below, the Court shall DENY Plaintiff's Motion for Partial Summary Judgment and shall GRANT IN PART AND DENY IN PART Defendants' Motion for Summary Judgment.

The Court shall DENY Defendants' motion to the extent that the Court declines to rule that Plaintiff is precluded from any backpay award by virtue of not having looked for work since his termination.

The Court shall GRANT Defendants' motion to the extent that the Court shall rule that: 1) the individual Defendants (Brisson, Sherman, and Ulmer) are entitled to summary judgment

1

as to Plaintiff's ADA claims because individual supervisors who do not independently qualify under the statutory definition of employers may not be personally liable in ADA cases; 2) Plaintiff cannot show that special circumstances existed such that he could reject Tapco's unconditional offer of reinstatement and Plaintiff would therefore be precluded from recovering backpay after June 22, 2012 if this matter were to proceed to trial; 3) Defendant Tapco is entitled to summary judgment as to Plaintiff's ADA claims against it, and all Defendants are entitled to summary judgment as to Plaintiff's PWDCRA claims them, because Plaintiff cannot establish that he is a qualified individual with a disability who can perform his job either with or without a reasonable accommodation; and 4) Defendants are entitled to summary judgment as to Plaintiff's FMLA retaliation claim because, in response to Defendants' properly supported Motion for Summary Judgment, Plaintiff has failed to meet his burden as to pretext.

## BACKGROUND

Plaintiff Walter Aston ("Plaintiff" or "Aston") filed this action on October 9, 2012. Plaintiff asserts claims against his former employer, Defendant Tapco International Corp. ("Defendant" or "Tapco"), along with claims against three of its managers: 1) Cheryl Brisson ("Brisson"), identified in the Complaint as Tapco's Human Resources Director; 2) Beth Sherman ("Sherman"), identified in the Complaint as Tapco's Office Manager; and 3) Dave Ulmer ("Ulmer"), identified in the Complaint as Tapco's Operations Manager.

Plaintiff's Complaint includes three counts: "Count I: Disability Discrimination Under Federal Law" that asserts a claim under the ADA against all Defendants; "Count II: Disability Discrimination Under State Law" that asserts a claim under Michigan's PWDCRA against all Defendants; and "Count III: Violation of the Family Medical Leave Act (FMLA)" asserted

2

against all Defendants.

Plaintiff's ADA count alleges that Plaintiff is an individual with a disability under the ADA in that he has conditions related to his heart and circulatory system that significantly limit him in the major life activities of lifting, carrying, pushing, pulling, and working.  (Pl.'s Compl. at ¶ 33).  Plaintiff alleges that he "is an individual who, with reasonable accommodation, could perform the essential functions of his job as a Facilities Maintenance/Shipping Receiving Manager working for TAPCO without undue hardship being caused to TAPCO."  (Pl.'s Compl. at ¶ 35).  Plaintiff alleges that he "was discriminated against by the Defendants" in that they terminated him because he had a physical impairment and that they discriminated against him "in that they refused to reasonably accommodate his physical limitations and simply refused to engage in the interactive process to explore how [his] limitations could have been reasonably accommodated."  (Compl. at ¶¶ 36 & 37).

Plaintiff's PWDCRA count alleges that Plaintiff is a person with a disability under the PWDCRA, that he "submitted a written request for accommodation" under the Act, and that Defendants violated the Act "by discriminating against the Plaintiff in the ways noted above." (Compl. at ¶¶ 42-44).

Plaintiff's FMLA count alleges that Defendants violated that Act "by terminating his employment in significant part because he took FMLA leave(s) and/or because he was expected to need to take one or more FMLA leave(s) in the future."  (Compl. at ¶ 49).

Plaintiff's Complaint seeks damages for loss of income, loss of fringe benefits, loss of pension and/or Social Security benefits, and mental distress damages.  Plaintiff also seeks unspecified equitable relief.

Following the close of discovery, on December 31, 2013, Defendants filed a Motion for Summary Judgment. (Docket Entry No. 22). On January 21, 2014, Plaintiff filed a Motion for Partial Summary Judgment. (Docket Entry No. 31).

This Court's practice guidelines, which are expressly included in the Scheduling Order issued in this case, provide, consistent with Fed. R. Civ. P. 56 (c) and (e), that:

> a. The moving party's papers shall include a separate document entitled Statement of Material Facts Not in Dispute. The statement shall list in separately numbered paragraphs concise statements of each undisputed material fact, supported by appropriate citations to the record. . .
>
> b. In response, the opposing party shall file a separate document entitled Counter-Statement of Disputed Facts. The counter-statement shall list in separately numbered paragraphs following the order or the movant's statement, whether each of the facts asserted by the moving party is admitted or denied and shall also be supported by appropriate citations to the record. The Counter-Statement shall also include, in a separate section, a list of each issue of material fact as to which it is contended there is a genuine issue for trial.
>
> c. All material facts as set forth in the Statement of Material Facts Not in Dispute shall be deemed admitted unless controverted in the Counter-Statement of Disputed Facts.

(Docket Entry No. 30 at 2-3).

Both parties complied with the practice guidelines. Thus, as to Defendants' Motion for Summary Judgment, Defendants submitted a Statement of Material Facts Not In Dispute, which shall be referred to as "Defs.' Stmt.," and Plaintiff filed a Counter-Statement of Disputed Facts, which shall be referred to as "Pl.'s Counter-Stmt." In addition, with respect to Plaintiff's Motion for Partial Summary Judgment, Plaintiff submitted a Statement of Material Facts Not In Dispute (Docket Entry No. 33), that shall be referred to as "Pl.'s Stmt." In response to that motion, Defendant submitted a Counter-Statement of Disputed Facts, that will be referred to as Defs.'

4

Counter-Stmt."

The following material facts are gleaned from the evidence submitted by the parties. They are undisputed, except where it is noted otherwise.

Tapco manufactures building materials such as shutters and decorative roofing materials. (Defs.' Stmt. at ¶ 1; Pl.'s Counter-Stmt. at ¶ 1).  Plaintiff was continuously employed by Tapco or its predecessor firm from January 1989 until his termination.  Tapco was a "covered entity" and an "employer" under the ADA for all times material to this case.  (Pl.'s Stmt. at ¶ 1; Defs.' Counter-Stmt. at ¶ 1).

Plaintiff was Tapco's Facilities Maintenance/Shipping Receiving Manager.  (Pl.'s Stmt. at ¶ 2; Defs.' Counter-Stmt. at ¶ 2).   Plaintiff worked at Tapco's headquarters in Wixom, Michigan and was responsible for building maintenance and also served as the shipping and receiving clerk and display builder.   (Defs.' Stmt. at ¶ 31; Pl.'s Counter-Stmt. at ¶ 3). The written job description for Plaintiff's position (Ex. 9 to Defs.' Motion) states that the essential job functions include: assisting with facility modifications, inspecting construction and installation processes, handling shipping and receiving functions, scheduling preventative maintenance of facility equipment, and overseeing of cleaning of facility and performing facility maintenance.  (*Id.* at 1).  The written job description states that the following is required as to the "physical demands" of the job:

- Regularly required to sit, stand, walk, bend, and lift objects of a minimum of 30 lbs and up to 60 lbs.

- Regularly required to climb ladders and reach above head to change lights and ballasts.

(*Id.* at 3).

Plaintiff had a triple bypass in May 2006.  (Pl.'s Stmt. at ¶ 3; Defs.' Counter-Stmt. at ¶ 3).  Tapco's company policy does not require it to grant more than the twelve weeks leave required by the FMLA.  (Defs.' Stmt. at ¶ 12; Pl.'s Counter-Stmt. at ¶ 12).  In 2006, Plaintiff had no problem obtaining FMLA leave or extra leave beyond twelve weeks.  (Defs.' Stmt. at ¶ 8; Pl.'s Counter-Stmt. at ¶ 8).  In fact, in 2006, Plaintiff was out for more than six months.  (Pl.'s Dep. at 9).

Tapco typically does not hold positions for employees who are unable to return to work after they exhaust their 26 weeks of disability benefits.  (Defs.' Stmt. at ¶ 14; Pl.'s Counter-Stmt. at ¶ 14).

Despite having the triple bypass in 2006, Plaintiff had a heart attack in May of 2010.  (Pl.'s Stmt. at ¶ 3; Defs.' Counter-Stmt. at ¶ 3).  Due to the heart attack, Plaintiff had to take FMLA leave and short-term disability leave.  He also had to receive treatments.  (Pl.'s Stmt. at ¶ 4; Defs.' Counter-Stmt. at ¶ 4).

On or about August 30, 2010, Brisson faxed a copy of the job description for Defendant's Facilities Maintenance and Shipping /Receiving Clerk job to Dr. Karabajakian's office, along with the following request: "Attached is a job description for our employee and your patient, Walter Aston.  We would like to know if/when he will be able to return to work and if he will require light duty based on the job description."  (Ex. 9 to Defs.' Motion).

On November 4, 2010, Dr. Karabajakian forwarded a completed Tapco Short Term Sick Pay Extension Form (Ex. 7 to Defs.' Motion), along with the copy of the job description Brisson had sent him, with restrictions noted (Ex. 9 to Defs.' Br.).

On the form that he completed, Dr. Karabajakian certified that Plaintiff was

"continuously disabled (unable to work)" from 5/22/10 through "current" and that Plaintiff could "return to work on January 1, 2011." (Ex. 7 to Defs.' Br.). That statement indicated that Plaintiff had a cardiac cath. and angioplasty on May 23, 2010 and described Plaintiff's course of treatment as "angioplasty, medical therapy & Scheduling for ICD."[1] (*Id.*).

Along with that completed form, Dr. Karabajakian also faxed back the job description, with his handwritten notes on it. (Ex. 9 to Defs.' Br.; Brisson Decl.). Dr. Karabajakian marked "ok" next to job functions listed on the first page of the job description. On that last page of it, however, he circled the entire box labeled as "Physical Demands" and starred and underlined the physical activities of having to regularly "sit, stand, walk, bend" and "lift objects of a minimum of 30lbs and up to 60lbs" and wrote "no lifting ≥30#." (*Id.*).

Dr. Karabajakian testified that while he had the written job description for Plaintiff's job, he did not speak with Plaintiff about the amount of time that Plaintiff actually engaged in various activities at work. (Dr. Karabajakian's Dep. at 71).

Brisson reviewed the completed form that Dr. Karabajakian's submitted to Tapco and "noted the upcoming ICD surgery and the return to work date of January 2011." (Brisson Decl.). Brisson "searched the internet for information about 'ICDs' and learned that the devices are implanted in heart patients to prevent sudden death." (*Id.*). Given the purpose of an ICD (i.e., to prevent sudden death), Brisson believed that the procedure was mandatory. (*Id.*).

It is undisputed that Dr. Karabajakian set the return to work date of January 1, 2011 to allow Plaintiff to have the ICD surgery and recuperate. (Defs.' Stmt. at ¶ 21; Pl.'s Counter-

---

[1]"ICD" is an abbreviation for an implantable cardioverter defibrillator, a device that "uses electrical pulses or shocks to help control life-threatening arrhythmias, especially those that can cause sudden cardiac arrest." www.nhlbi.nih.gov/health/health

Stmt. at ¶ 21).  Plaintiff testified that Dr. Karabajakian told him he was giving him a return-to-work date of January 1, 2011, "[b]ecause of the ICD procedure that we were gonna have done." (Pl.'s Dep. at 62-63).  Dr. Karabajakian testified that he did not consider the placement of the ICD as optional as to Plaintiff.  (Karabajakian Dep. at 33).

On November 16, 2010, Plaintiff called Brisson, who handled human resources for Tapco.  "They discussed Plaintiff's insurance benefits, but then discussed Plaintiff's employment status."  (Pl.'s Stmt. at ¶ 5; Defs.' Counter-Stmt. at ¶ 5).  The parties differ as to the substance of the conversation.

Plaintiff contends that Brisson told her they had pretty much decided to terminate his employment and that he should go on long-term disability.  (Pl.'s Decl.; Pl.'s Dep. At 2). Plaintiff states that Brisson told him they felt the job was too much for him, that his doctor had placed him on restrictions, and that they needed him to return to work without any restrictions, and that he had until November 22nd to return to work.  (*Id*.).  He states that Brisson told him that the decision was not final and she had to discuss things with Ulmer.  (*Id*.).

On November 18, 2010, Plaintiff called Dr. Karabajakian's office and spoke with a nurse named Diane.  (Pl.'s Dep. at 75-76).  Plaintiff told her that he was going to lose his job if he "couldn't get Dr. K to release me back to work" and Diane told him that "she would pass on the information to Dr. K."  (*Id*.).  Dr. Karabajakian's office documented the phone call with a telephone message that said "his job needs a work note w/ 30 lb restriction that he can return please fax to 248 668 6255 Attn: Sheryl Brisson   He needs this done ASAP."  (Ex. 13 to Defs.' Motion).

"On November 18, 2010, and based on Plaintiff's call to his office, Plaintiff's doctor sent

8

Tapco amended restrictions for his return to work.  The only restriction was a 30-pound lifting restriction."  (Pl.'s Stmt. at ¶ 9; Defs.' Counter-Stmt. at ¶ 9; Ex. 14 to Defs.' Br.).  The form that Dr. Karabajakian's office faxed to Tapco stated Plaintiff could "Return to work 11/22/10" with a "30 lb weigh restriction."  (Ex. 14 to Defs.' Br.).  It did not explain why the restrictions or return-to-work date for Plaintiff had changed since Dr. Karabajakian provided the first form to Tapco.  (*Id.*).

Dr. Karabajakian "did not meet with, examine, or speak to Plaintiff before his office faxed to Defendant the November 18, 2010 note returning Plaintiff to work on November 22, 2010."  (Defs.' Stmt. at ¶ 44; Pl.'s Counter-Stmt. at ¶ 44).

Dr. Karabajakian testified that he does not recall why he changed Plaintiff's return-to-work date from January 1, 2011 to November 22, 2010.  (Dr. Karabajakian Dep. at 64-65).  He also testified that it would not have been a good idea for Plaintiff to return to a physical job at Tapco without having an ICD.  (Dr. Karabajakian's Dep. at 65-66).

On either November 18, 2010, or November 19, 2010, Plaintiff left Brisson a message stating that he would report to work on November 22nd at 8:00 a.m. if he did not hear back from them.  (Pl.'s Stmt. at ¶ 10; Defs.' Counter-Stmt. at ¶ 10).  At that point, Plaintiff had not yet had the ICD procedure.

Brisson believed that Dr. Karabajakian's November 18th note did not reflect his true opinion but rather, was the product of his desire to help Plaintiff keep his job.  (Brisson Decl.). Dr. Karabajakian testified that he can understand how someone in human resources who had been given a specific return-to-work date from a doctor and then all of sudden gets an earlier return-to-work date from the same doctor would be concerned about the validity about the earlier

date.  (Dr. Karabajakian's Dep. at 67).

On November 22nd, around 3:20 p.m., Brisson and Plaintiff's direct supervisor,

Sherman, called Plaintiff and told him that he was terminated.  (Pl.'s Stmt. at ¶ 12; Defs.'

Counter-Stmt. at ¶ 12).

Thereafter, Brisson sent Plaintiff a letter on November 22, 2010 (erroneously dated

November 16, 2019), informing him of his termination and stating:

> We are in receipt of your physician's notes dated 10/21/10 indicating you were
> able to return to work with restrictions after 1/1/11.  We are also in receipt of your
> physician's note dated 11/18/10 indicating you are able to return to work on
> 11/11/10 with restrictions – no lifting more than 30 lbs.  As you are not able to
> return to work with a release for full duty and due to the requirements of your job,
> we regret to inform you that we cannot accept a release other than to full duty.
> Therefore, your employment has been terminated effective 11/22/10.

(Ex. 3 to Pl.'s Br.; *see also* Pl.'s Stmt. at ¶ 13; Defs.' Counter-Stmt. at ¶ 13).

Tapco granted Plaintiff 14 weeks of leave after the expiration of his FMLA leave up

through the date of his termination.  (Pl.'s Stmt. at ¶ 32; Defs.' Counter-Stmt. at ¶ 32).

Following his termination, on December 3, 2010, Plaintiff sent Tapco a letter stating, in

pertinent part:

> I was terminated effective November 22, 2010, because the company was
> unwilling to accommodate medical conditions relative to my heart.  I have had
> problems with my heart for years.  To try to address the conditions, I even had to
> have triple bypass in May 2005 [sic].  Unfortunately, I still ended up having a
> heart attack in May 2010.  Due to the heart attack, I had to take short term
> disability leave and had to receive treatment.  Then I tried to return to work with
> restrictions as stated in my doctor's note dated October 21, 2010 and then with
> amended restrictions as stated in my doctor's note dated November 18, 2010.  The
> company refused to grant my request to return to work under either set of
> restrictions or grant the accommodations I asked for based on the restrictions.
> Instead, I was terminated effective November 22, 2010 as stated in Ms. Brisson's
> letter to me dated November 16, 2010.

10

Because the company refused to grant the accommodations and terminated my employment, I had another medical procedure done for my heart on Monday, November 29, 2010. *I now will not be able to return to work until my cardiologist clears me to return,* although I gladly would have returned to work under either set of restrictions instead of having the procedure on November 29th.

I have sent this letter to you to ask for my job back. I truly want and need my job.

I have also sent this letter to inform you and the company in writing of my need for accommodations whether or not the company decided to let me have my job back. Originally, I needed the company to let me return to work with restrictions after January 1, 2011 as stated in my doctor's note dated October 21, 2010. I then needed the company to let me return to work on November 22, 2010 with a restriction of no lifting more than 30 pounds as stated in my doctor's note dated November 18, 2010. *Now, if the company will rehire me, I ask the company to accommodate my current condition due to the surgery* I had this week since the company would not let me return to work on November 22nd. *I ask the company to let me return to work after my cardiologist clears me to return with any possible restrictions he may require.*

I thank you and the company for your consideration. I would appreciate knowing whether the company will rehire me and will grant the requested accommodation as soon as possible.

(Ex. 26 to Defs.' Motion) (emphasis added).

After Plaintiff was terminated, no one was hired to perform his duties for about five months and Tapco made due by having other employees perform parts of his duties. (Pl.'s Stmt. at ¶ 34; Defs.' Counter-Stmt. at ¶ 34). Tapco then hired employees Jim Hughes, and later Doug Collins after Hughes left Tapco, who performed the position on a part-time (20 hours per week) basis. (*See* Ex. 8 to Pl.'s Br.; Sherman Dep.).

**Certifications To Lincoln National**

Plaintiff applied for, and received for a period of time, long-term disability under a private policy with Lincoln National ("Lincoln").

On December 8, 2010, Dr. Karabajakian certified to Lincoln that the first date Plaintiff

11

was unable to work was May 23, 2010.  (Ex. 17 to Defs.' Motion).  He stated that Plaintiff's last office visit was on October 22, 2010, and that Plaintiff had achieved maximum medical improvement.  (*Id.*).  Dr. Karabajakian stated that, in an eight-hour work day, Plaintiff could only stand for four hours and could only walk for four hours.  He also stated that Plaintiff could not lift or carry more than 30 pounds.  (*Id.*).

Defendant Tapco completed a form regarding Plaintiff's application for disability with Lincoln on December 10, 2010.  (Ex. 16 to Defs.' Motion).  Tapco indicated a disability date of May 23, 2010 for Plaintiff.  Tapco indicated that in his job Plaintiff would:  1) stand and walk frequently or continuously; 2) reach or work overhead frequently or continuously; 3) climb continuously; 4) climb stairs or a ladder frequently; and 5) sit or crawl only occasionally (0-33% of the day).

Plaintiff later certified to Lincoln National, on April 20 2011, that he could only sit, stand or walk continuously for four hours.   (Defs.' Stmt. at ¶ 68; Pl.'s Counter-Stmt. at ¶ 68).  He stated that he could never lift more than 30 pounds and could lift 21-30 pounds only occasionally (0-33%).  (Ex. 18 to Defs.' Br.).  On that statement, Plaintiff indicated that he felt "anxious" about returning to work because "I do not know how my body will react yet in a work setting."  (*Id.*).

On October 29, 2012, Dr. Karabajakian certified to Lincoln that Plaintiff could "occasionally" (1-33% of the day) carry 1-10 pounds, but could "never" ((0%) of the time) carry more than 10 pounds.  (Ex. 10 to Defs.' Motion).  Dr. Karabajakian also certified that Plaintiff could sit, stand, or walk only "occasionally" (0-33% of the day) and that he could "never" climb, drive, or operate foot controls."  (*Id.*).

12

On November 23, 2012, Lincoln advised Plaintiff that it was terminating long term disability benefits beyond November 18, 2012. (Ex. 14 to Pl.'s Appx.). Lincoln advised that, even if he could not perform his previous job, it had determined that he is "not limited from working in a sedentary work capacity," defined as "[s]itting for 6 hours out of an 8-hour day and lifting no more than 10 pounds occasionally." (*Id.*).

**Certifications To The Social Security Administration**

Plaintiff also applied for, and received, disability benefits from the Social Security Administration ("SSA").

In a statement Plaintiff provided to the SSA on June 6, 2011, Plaintiff noted that the last job he held was his position of Building Maintenance / Shipping and Receiving Clerk with Tapco and that he held that job from 1-11-89 to 11-22-10. (Ex. 1 to Defs.' Br.). Plaintiff stated that he had worked 8-10 hours per day in that job, five days per week. That form asked Plaintiff to indicate how many hours each day he did certain things, while performing that job, and Plaintiff answered that he: 1) walked 8-10 hours per day; 2) stood 8-10 hours per day; 3) sat ½ to 1 hour per day; 4) stooped (bending down and forward at waist) 8-10 hours per day; 5) kneeled and crouched 8-10 hours per day; and 6) reached "all day," 8-10 hours per day. (*Id.*). In a narrative portion of that statement, Plaintiff explained "I would be on my feet all but ½ Hr. Lunch, 2 - 15 minute breaks, sometimes skipping or only taking 5-30 minutes depending on how much work there was to do or catch up on. Lifting anything over 20 lbs was something I didn't do a lot of." (*Id.*).

The SSA initially denied Plaintiff's application for benefits but Plaintiff filed an appeal. In connection with his appeal, Plaintiff declared under oath that: 1) he was claiming "total

13

disability;" and 2) that he was totally disabled from "11/23/10 to present." (Ex. 21 to Defs.'

Motion).  Plaintiff also stated the following in a section marked "please explain:" "Social

Security has been applied for but not received.  Total Disability applies as long as restrictions are

not accommodated."  (*Id*.).  Plaintiff also stated, "I do not expect to return to work unless an

employer accommodates my lifting restriction" of "no lifting over 30 lbs."  (*Id*.).

On May 9, 2012, an Administrative Law Judge held that Plaintiff has been disabled from

May 16, 2011, and is expected to be disabled for at least a year, stating:  "After careful review of

the entire record, the undersigned finds that the claimant has been disabled from May 16, 2011,

and is expected to be disabled for a continuous period of at least twelve months (20 CFR

404.1520(g))."  (Ex. 12 to Pl.'s Br.).

### Tapco's Unconditional Offer Of Reinstatement

On May 31, 2012, Tapco offered Plaintiff reinstatement that would honor his 30 pound

lifting restriction.   (Defs.' Stmt. at ¶ 76; Pl.'s Counter-Stmt. at ¶ 76; *see also* Ex. 23 to Defs.'

Br.).  Tapco's May 31, 2012 letter, directed to Plaintiff's Counsel, stated:

> I am pleased to advise you that our client hereby extends an unconditional offer of
> reinstatement to your client.  The offer is for the same position that your client
> occupied before his leave of absence expired, at the same pay and under the same
> and other terms and conditions.
>
> We enclose a job description which incorporates his prior duties except those that
> require lifting of over 30 pounds.  Thus, not only is Tapco offering
> unconditionally to reinstate your client, it is also endeavoring to accommodate his
> lifting restriction by eliminating those elements of his prior responsibilities that
> required such lifting.  In place of those deleted responsibilities, additional
> facilities maintenance work, some of which had been contracted out, has been
> added to the description.  Tapco is pleased to note that its accommodation in
> adjusting Mr. Aston's job description will enable him to fill out his workday, all
> the while, not having to engage in any activities that would required lifting of

more than 30 pounds.

Please advise at your earliest convenience, but in no case later than 14 days from the date of this letter, whether your client will return to employment with Tapco.

(Ex.13 to Pl.'s Resp. Br.).  Thus, as part of their offer to reinstate Plaintiff, Tapco was willing to

honor his 30-pound lifting restriction.  (Pl.'s Stmt. at ¶ 33; Defs.' Counter-Stmt. at ¶ 33).

In a letter dated June 22, 2012, Plaintiff's attorney rejected the offer.  (Ex. 24 to Defs.'

Br.).  In doing so, Plaintiff's counsel stated, in pertinent part:

. . . Mr. Aston must decline the offer for three reasons, some of which are inter-related.

First of all, the position offered is not the same as or substantially equivalent to the position that Mr. Aston had before his leave of absence expired. The "additional facilities maintenance work" alluded to in your letter dated May 31, 2012 and described in the job description under "Essential Duties and Responsibilities" would encompass significantly more duties and would require significantly more time and work to perform than Mr. Aston's duties as previously performed.

Second, *Mr. Aston is uncertain whether he can perform all of the duties of the offered position for health reasons*.  Mr. Aston cannot evaluate the new job function of "will be required to perform other duties as requested, directed or assigned" in relation to his physical limitations, because the duties have not been described. Plus, under "Essential Duties and Responsibilities", *Mr. Aston believes that he may not be able to perform certain duties due to his physical limitations. Further, Mr. Aston believes that he is likely to need additional accommodations relative to and may not be able to perform some duties due to his ICD implant*. . . . .

Third, Mr. Aston must decline the offer at this time since the capacities of Tapco's employees to honor the law as well as the parties' past, present and future dealings are likely to preclude any satisfactory employment relationship and may result in *dangerous employment conditions for Mr. Aston*.  Mr. Aston will have to work with and trust Tapco to appropriately supervise and manage him.  Yet, the last time he did so, Tapco supervisory/management personnel violated the law. Now, with Mr. Aston's claims against Tapco and those same personnel pending, and soon likely to include them as individual defendants, Mr. Aston will be expected to trust these same personnel to reasonably accommodate him, to treat him fairly, and not to retaliate against him.  And if they fail in any of

> these respects, as they have in the past, Mr. Aston may not simply find himself
> out of a job – *he might die*.  Particularly in light of Mr. Aston's other reasons for
> rejecting Tapco's offer of reinstatement, this is a risk that Mr. Aston simply
> cannot afford to take.

(*Id.*) (emphasis added).

### Plaintiff's Deposition Testimony And Declaration

During his deposition in this action, Plaintiff testified that he was aware that Defendant had sent him a letter offering to reinstate him, along with a modified job description that reduced the lifting requirements for the position to no more than 30 pounds.  (Pl.'s Dep. at 129-132). During his deposition, Plaintiff was asked to review that modified job description.  (*Id.*). Plaintiff was then asked if there was anything in the job description that he could not do and he answered no:

> Q.   Well, look at Exhibit – look at the Job Description that's included as part
>        of Exhibit 31 and tell me if there's anything in this Job Description that
>        you could not do.
> A.   On this first page?
> Q.   The whole thing. Just take your time.
> A.   Okay.
> Q.   And you'll note on the third page, it says, "Modification, will not lift over
>        30 pounds"?
> A.   Okay.
> Q.   That's what it says; right?
> A.   It says, "Will not lift over 30 pounds", yes.
> Q.   Okay.  And is there anything in this Job Description that indicates to you
>        that you could not do the job described in the Job Description?
> A.   No.

(Pl.'s Dep. at 131-32).

Plaintiff testified that he has not applied for any employment since being terminated by Tapco and that he has not looked for any employment opportunities that would honor his

16

restrictions.  (Pl.'s Dep. at 7, 41, & 128-29).

Plaintiff testified that while he did not like losing his job, he has no hard feelings toward

Brisson, Sherman, or anyone else at Tapco.  (Pl.'s Dep. at 133).

In opposing Defendants' Motion for Summary Judgment, Plaintiff submitted a

Declaration that states, in pertinent part:

22.  Prior to my termination, my normal work week was 40 hours.  I did not work 16+ hours a day or reach continuously all day.  My normal work day was 8 hours.

23.  When I filled in forms, I tried to be accurate.  Yet at times, I listed the range of time that I might to [sic] something (like walk) on any given day or when I might have to do something (like reach) on any given day.

24.  I made a mistake when I answered the following question of the EEOC Supplemental Questionnaire form: "Are you able to perform those duties either with or without an accommodation?"  By answering "NO", I meant that I could not perform the duties except if I got an accommodation.  Upon looking at it more closely, I realize that I should have answered "YES" to indicate that I could perform the duties with an accommodation.

. . . .

26.  I directed my lawyer to send a letter rejecting the offer of reinstatement made by TAPCO for several reasons including, but not necessarily limited to, the following:

(a)  I did not trust TAPCO and its supervisory/management level employees to honor the law where they already had violated it.  Especially given my physical impairment, I did not want to take a chance of getting hurt if they did not do the right thing.

(b)  I also did not trust the offer as being in good faith.  TAPCO had opportunities to reinstate me in November 2010 and December 2010.  Instead of doing so, they waited over a year and a half after I was terminated to make the reinstatement offer.

(c)  I was concerned about duties that were not clearly described or specified. I was concerned about how much time they could take, although I felt I could perform them within limits.

(d)  I was concerned about grass-cutting and snow removal.  I have hay fever and grass-cutting could be a problem depending on how long I would have to do it.  Snow removal could also be a problem without proper equipment.  Also, I had concerns about being out in

17

the heat or cold for too long.

(Pl.'s Decl, Docket Entry No. 38-20, at ¶¶ 22-26).

### Dr. Karabajakian's Deposition Testimony

Dr. Karabajakian was deposed in this action on December 4, 2013.  During his

deposition, Dr. Karabajakian was shown the certification that Plaintiff submitted to the SSA,

wherein he stated how many hours per day he did various actions in performing his job at Tapco.

(Dr. Karabajakian's Dep. at 58-59).  Dr. Karabajakian testified that, given the physical demands

of Plaintiff's job, as described by Plaintiff himself, Plaintiff has been unable to perform that job

since May 23, 2010, the date he had his heart attack:

> Q.      Okay.  If Mr. Aston certified to the Social Security Administration in his
>         application for disability benefits that he spent eight to ten hours a day
>         walking in his job at Tapco, would you return him to work?
> A.      At the time, no.  I would not.
>         MR. MIOTKE: I'm going to object on the form.
> BY MR. FETT:
> Q.      At what time?
> A.      What time are you talking about?
> Q.      Any time?
>         MR. MIOTKE: Some objection on form.
>         THE WITNESS: I would not have cleared him to return to work right after
> his MI which was in May of 2010.  I would not have returned him to work
> through November of 2010.

(Dr. Karabajakian's Dep. at 59-60).  He also testified that Plaintiff would not have been cleared

to perform the activities of his job as of December 20, 2010:

> Q.      Let's start with 12-20-2010.  Twenty days after he had the ICD implant.
>         Okay.  At that time if he had to walk and stand for eight to ten hours a
>         day, would you release him to go back to work?
>         MR. MIOTKE: Objection.  Form and foundation.
>         THE WITNESS: I would not.
> BY MR. FETT:

18

> Q.      Okay.  If he had to reach, do reaching all day, would you let him go back
> to work, again 12-20-2010?
> MR. MIOTKE: Objection.  Form. Foundation.
> THE WITNESS: I would not.

(Dr. Karabajakian's Dep. at 63).

Dr. Karabajakian also testified that, as of October 29, 2012, he would not have cleared

him to work the job as described by Plaintiff.  (*Id.* at 64).

Dr. Karabajakian testified that "[f]rom May of 2010 up until the point where he got the

ICD" Plaintiff's physical condition was getting worse.  (*Id*. at 68-69).  Dr. Karabajakian testified

that he would not have cleared Plaintiff to work the job as described by Plaintiff if Plaintiff did

not have the ICD:

> Q.      Just to summarize, and again going back to Exhibit Q, the second page, in
> the middle, if, if Walt's job really entailed the physical activity reflected in
> Exhibit Q, page two, you would not have wanted him to return to work as
> of 12-20-10?
> A.      That is correct.
> Q.      You certainly would not have wanted him to go back to work even as of
> 10-29-12?
> A.       He had not been back to work yet at that point so not as described here.

(*Id.* at 70).

Dr. Karabajakian equivocated on whether or not Plaintiff could, as of the date of his

deposition (December 4, 2013), perform the job, saying he is "in the process of evaluating that."

(*Id*. at 61 & 73).

**The Pending Motions**

Defendants' Motion for Summary Judgment seeks summary judgment in their favor as to

all of Plaintiff's claims.  First, the individual Defendants seek dismissal of the ADA claims

19

asserted against them because they do not qualify as employers.  In addition, all Defendants seek summary judgment as to Plaintiff's disability claims under both the ADA and the PWDCRA on multiple grounds.  Defendants argue that the Court should preclude Plaintiff from recovering monetary damages in any event because Plaintiff failed to mitigate his damages in that he: 1) admits that he never sought work after losing his job; and 2) rejected Tapco's unconditional offer of reinstatement.  But their chief argument is that, based on the testimony of his own physician, Plaintiff cannot establish that he is a qualified individual who can perform the job with a reasonable accommodation.  Defendants also challenge Plaintiffs' FMLA claim, asserting that Plaintiff cannot establish pretext, even if he could establish a prima facie case of retaliation.

Plaintiff's Motion for Partial Summary Judgment seeks summary judgment, as to liability only, with respect to his ADA claims against Tapco.  (Docket Entry No. 31).

**Standard of Decision**

Under Fed. R. Civ. P. 56(a), summary judgment is proper when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  "No genuine dispute as to any material fact exists where the record 'taken as a whole could not lead a rational trier of facts to find for the non-moving party.'" *Shreve v. Franklin County, Ohio*, __ F.3d __, 2014 WL 463477 (6th Cir. 2014) (citing *Matsushita Elec. Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  "Ultimately, the court evaluates 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Shreve, supra* (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 251-52 (1986)).

On summary judgment, the Court views the facts and draws all inferences in the light

20

most favorable to the non-moving party.  *Id.*  Fed. R. Civ. P. 56(c)(1) provides:

> (1) Supporting Factual Positions.  A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
>> (A)   citing to particular parts of material in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>>
>> (B)   showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

## ANALYSIS

### I.   Plaintiff's ADA Claims Against The Individual Defendants

In their motion, the individual defendants contend that they are entitled to summary judgment as to Plaintiff's ADA claims asserted against them based upon the Sixth Circuit's decision in *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 808 n.1 (6th Cir. 1999).

In *Sullivan*, the Sixth Circuit explained that "[i]ndividual supervisors who do not independently qualify under the statutory definition of employers may not be personally liable in ADA cases." *Id.*

In response to Defendants' motion, Plaintiff expresses his disagreement with the law on this issue, but concedes that this Court is bound to follow Sixth Circuit authority.  (*See* Pl.'s Resp. Br. at 3 n.2).

This Court shall dismiss the ADA claims against the individual Defendants (Brisson, Sherman, and Ulmer).

21

II.     **Plaintiff's Alleged Failure To Mitigate Damages**

In their motion, Defendants ask the Court to rule that Plaintiff failed to mitigate his damages in two respects, which reduce or eliminate his ability to recover monetary damages in this action even if he were to prevail on his claims.

A.     **Plaintiff Not Seeking Work Following His Termination**

First, Defendants contend that because Plaintiff admits that he has not looked for work since his termination, Defendants are entitled to partial summary judgment in that the Court should rule that Plaintiff is not entitled to an award of backpay.  (Defs.' 12/31/13 Br. at 20).

In response, Plaintiff asserts that Defendants' argument must be rejected based on Sixth Circuit law.  Plaintiff states that in order to meet their burden of proving he failed to mitigate his damages, under *Rasimas*, Defendants must prove: 1) there were substantially equivalent positions which were available; and 2) that Plaintiff failed to use reasonable diligence in seeking such positions.  (Pl.'s 1/24/14 Br. at 19) (*citing Rasimas v. Mich. Dep't. of Mental Health*, 714 F.2d 614, 623-24 (6th Cir. 1983).  Plaintiff contends that, here, Defendants have failed to meet their burden of showing that any substantially equivalent positions were available and their argument must therefore be rejected at the summary judgment stage.

In their Reply Brief, Defendants assert that unlike the plaintiff in *Rasimas*, Plaintiff does not claim to have exercised reasonable diligence in finding work.  Citing a First Circuit case, they assert that in such circumstances courts have "uniformly" relieved the defendant-employer of the burden to prove the availability of substantially equivalent jobs.  (Defs.' 2/7/14 Br. at 6) (*citing Quint v. Staley Mfg. Co.*, 172 F.3d 1, 16 (1st Cir. 1999)).

The Court declines to rule that Plaintiff is precluded from an award of back pay in this

22

action because he has not sought work since his termination.

A prevailing ADA plaintiff can obtain, among other things, an award of back pay that would have accrued from the termination date to the entry of judgment, so long as the plaintiff was reasonably diligent in seeking to obtain other suitable employment. *Quint*, 172 F.3d at 15. In *Quint*, the First Circuit explained that "[a]s long as the claimant has made some effort to secure other employment, the burden to prove failure to mitigate normally resides with the defendant employer" and that employer "then must show that (i) though substantially equivalent jobs were available in the relevant geographic area, (ii) the claimant failed to use reasonable diligence to secure suitable employment." *Quint*, 172 F.3d at 16.

The *Quint* Court noted that "[i]n the relatively rare case where an employee has remained completely idle following her discharge, *some courts of appeals* have required that the defendant-employer nonetheless demonstrate the same two elements: (1) the availability of substantially equivalent jobs and (2) the absence of reasonable diligence by the former employee." *Id*. (emphasis added). It then cited several cases – including the Sixth Circuit's decision in *Rasimas*.

The *Quint* court then stated that "*[o]ther courts of appeal*, squarely confronted with the present contention, uniformly have relieved the defendant-employer of the burden to prove the availability of substantially equivalent jobs in the relevant geographic area once it has been shown that the former employee made no effort to secure suitable employment." *Id*. (citing decisions from the Second, Eleventh, and Fifth Circuits.) (emphasis added). The First Circuit adopted the mitigation-defense exception adopted by the Second, Eleventh, and Fifth Circuits.

The Sixth Circuit, however, has not adopted the mitigation-defense exception. *Rasimas;*

23

*see also Ford v. Nicks,* 866 F.2d 865, 873 (6th Cir. 1989); *Taylor v. Invacare Corp.,* 64 F.

App'x. 516, 523 (6th Cir. 2003); *Voyles v. Louisville Transp*. Co., 136 F. App'x. 836,838 (6th

Cir. 2005).  Given that the Sixth Circuit has not adopted this exception, this Court declines to

rule that Plaintiff is precluded from an award of backpay because he has not sought work since

his termination.

### B.    Plaintiff's Rejection Of Defendant's Offer Of Reinstatement

Second, Defendants contend that Plaintiff failed to mitigate his damages by rejecting its

May 31, 2012 offer of reinstatement.  (Defs.' 12/31/13 Br. at 20.).  Defendant Tapco assert that

"Plaintiff's unjustified rejection of Tapco's unconditional offer of reinstatement constitutes a

failure to mitigate and ends the accrual of economic damages of as of June 22, 2012, the date of

Plaintiff's rejection.  *Ford Motor Co. v. EEOC*, 458 US 219, 102 S.Ct. 3057 (1982).  The court

should therefore grant partial summary judgment as to damages on this basis as well."  (*Id*.).

In response, Plaintiff asserts that "questions of fact preclude Defendants' argument that

Plaintiff's economic damages cannot accrue after their offer of reinstatement," asserting:

> Absent special circumstances, the rejection of an employer's unconditional job
> offer ends the accrual of potential backpay liability.  *Ford Motor Co. v. EEOC,*
> 458 U.S. 219, 241 (1982).  Special circumstances include situations in which the
> employer's offer is not made in good faith or where there employee's rejection of
> the offer is reasonable.  *Brown v. Alabama Dept. of Transportation*, 597 F.3d
> 1160, 1183 (11th Cir. 2010).  For example, such an offer is not considered to be
> in good faith where it is a "litigation tactic."  *Hogan v. Bangor and Aroostook
> Railroad Co.*, 61 F.3d 1034, 1038 (1st Cir. 1995).  In this case, there are good
> reasons for the Plaintiff's rejection of the offer including: (1) Plaintiff's concerns
> that the Defendants had already violated the law and may violate it again thus
> endangering him, (2) the Defendants' lack of good faith in making the offer
> where they refused to reinstate him over 18 months earlier, (3) lack of specificity
> and description of some duties, and (4) concerns about grass-cutting, snow
> removal, and extremes in temperatures.  Exh. 19, para. 25.  Indeed, as Plaintiff's
> counsel pointed out in the rejection letter, this simply appears to be a litigation
> tactic.  See Doc. #24, Exh. 24, p. 2.  This assessment appears to be spot on where:

> 1. The Defendants have insisted that they believed that the Plaintiff was "totally and permanently disabled" and thus unable to do his job. 2. The Defendants' attorney referred to the offer of reinstatement as follows: "Defendants Call Plaintiff's Bluff With Offer of Unconditional Reinstatement."  Doc. #23, p.15.

(Pl.'s 1/12/14 Br. at 19-20).

The Sixth Circuit has explained that the "Supreme Court has held that 'an employer charged with unlawful discrimination often can toll the accrual of backpay liability by unconditionally offering the claimant the job he sought, and thereby providing him with an opportunity to minimize damages.'"  *Madden v. Chattanooga City Wide Serv. Dep't.*, 549 F.3d 666, 678-79 (6th Cir. 2008).

In *Ford Motor Co. v. EEOC*, the Supreme Court explained that the primary objective of federal employment discrimination statutes is "to end discrimination; the victims of job discrimination want jobs, not lawsuits." *Ford Motor Co. v. EEOC*, 458 U.S. at 230.  "But when unlawful discrimination does occur" the secondary, fallback purpose of those laws is to compensate the victims for their injuries.  To that end, the law aims to make the victims of unlawful discrimination whole by restoring them, so far as possible, to a position where they would have been were it not for the unlawful discrimination.  *Id.*

In addition, the rules fashioned to implement employment discrimination statutes are designed to encourage employers to promptly make curative, unconditional job offers to claimants, "thereby bringing defendants into 'voluntary compliance' and ending discrimination far more quickly than could litigation proceeding at its often ponderous pace."  *Id.* at 228.

If a discrimination plaintiff rejects an unconditional offer from the defendant employer, then tolling the employer's backpay liability from the time of that offer is consistent with the goal of providing a plaintiff full compensation for their injuries.  *Id.*  This is because an

unemployed claimant has a duty to minimize his damages. *Id*. at 231. "Consequently, an employer charged with unlawful discrimination often can toll the accrual of backpay liability by unconditionally offering the claimant the job he sought, and thereby providing him with an opportunity to minimize his damages." *Id*. at 232. Thus, "absent special circumstances, the rejection of an employer's unconditional job offer ends the accrual of potential backpay liability." *Id*. at 241.

Plaintiff has not identified any Sixth Circuit decisions wherein the Court gives guidance as to the "special circumstances" under which a plaintiff can refuse an unconditional offer of reinstatement and nevertheless not lose the ability to recover backpay. This Court has not found any Sixth Circuit decisions wherein a plaintiff rejected an unconditional offer of reinstatement yet nevertheless was able to pursue back pay because sufficient "special circumstances" existed.

Rather than direct the Court to any Supreme Court or Sixth Circuit cases to support his position, Plaintiff directs the Court to two non-binding decisions.

Plaintiff directs the Court to the Eleventh Circuit's decision in *Brown*. In that case, the plaintiff declined an offer of reinstatement to a position in specific division because of a racially hostile work environment there. *Brown*, 597 F.3d at 1183-84. Notably, in that case there was evidence that the plaintiff's "former co-worker Freddie Golthy, an African-American who participated with [the plaintiff] in the *Reynolds* litigation, was murdered on the Eighth Division premises by a white employee, that the homicide was racially motivated, and that the area was known for its prevalent racism." *Id.*

This case can be readily distinguished from *Brown*. There is no evidence that Plaintiff would face a hostile or dangerous environment if he was to accept Defendant's offer of

reinstatement.  To the contrary, Plaintiff testified that although he did not like losing his job, he has no hard feelings toward Brisson, Sherman, or anyone else at Tapco.

Plaintiff also directs the Court to the First Circuit's decision in *Hogan* for the broad proposition that a claimant does not fail to mitigate his damages where he rejects an offer of reinstatement that he believes is "a litigation tactic."  But the decision does not stand for that proposition.  In *Hogan*, the employer argued that the employee's "refusal to take a Functional Capacity Evaluation ('FCE') specifically designed for him" "constituted a failure to mitigate back pay damages" and that the district court erred in not so ruling.  *Hogan*, 61 F.3d at 1038.   In rejecting that argument, the First Circuit explained that even if the plaintiff had taken and passed that test, "it was by no means clear that [the plaintiff] was to be reinstated to his job upon completion of the FCE."  *Id*.  That is, the court concluded that the defendant had not met its burden of establishing that it actually made an unconditional job offer to the plaintiff and ruled that "[i]n the absence of a concrete offer of reinstatement, the period of back pay accrual does not end."  *Id*.  The court only used the phrase "litigation tactic" in noting that the district court believed that the employer's "suggestion that [the plaintiff] undertake the testing regime was a litigation tactic."  *Id*.  Thus, *Hogan* does not aid Plaintiff.

Moreover, to the extent that Plaintiff argues that he should not have to accept a reinstatement offer that he believes the defendant-employer has made for strategic purposes during litigation, or that such an offer is not made in good faith because the employer is just trying to minimize its damage exposure, Plaintiff misses the point of *Ford Motor v. EEOC*.  The Supreme Court has expressly held that a defendant-employer charged with discrimination can "toll the accrual of backpay liability by unconditionally offering the claimant the job he sought,

27

and thereby providing him with an opportunity to minimize his damages." Thus, to the extent that a defendant-employer attempts to stop the accrual of backpay by unconditionally offering the plaintiff the job he sought, that strategy has been expressly endorsed by the Supreme Court.

In attempting to justify his rejection of Defendant Tapco's unconditional offer of reinstatement, Plaintiff also asserts that he has "concerns that the Defendants had already violated the law and may violate it again thus endangering him."

But the same could be asserted by *every plaintiff* who files suit against his or her employer and is then offered reinstatement. That is, every plaintiff who sues his employer believes that the employer violated employment discrimination laws. If a plaintiff-employee could reject an unconditional offer of reinstatement just because he believes his employer violated the law in some respect in the first place, and could potentially do it again, that would eviscerate the rationale of *Ford Motor Co. v. EEOC* and would allow every plaintiff to reject an unconditional offer of reinstatement.

Finally, although Plaintiff testified during his deposition that he could perform the modified job he was offered, Plaintiff now contends that he has concerns about grass cutting because he hay-fever, concerns about snow removal, and concerns about exposure to hot or cold temperatures. Plaintiff has submitted a Declaration so stating. That declaration contradicts Plaintiff's own deposition testimony that he could perform the modified job. In addition, although his own physician says otherwise, Plaintiff has asserted to Tapco that the only restriction he has is a 30 pound restriction on lifting and that is the modified job that Tapco offered to Plaintiff. Thus, these assertions about new additional restrictions about hay-fever, etc. are not a valid basis to reject the unconditional offer of reinstatement.

Accordingly, even construing the evidence in a light most favorable to Plaintiff, Plaintiff cannot show that special circumstances existed such that he could reject the unconditional offer of reinstatement but nevertheless seek backpay after the date he rejected the offer.  The Court therefore rules that, even if his claims were allowed to proceed, Plaintiff would be precluded from recovering backpay after June 22, 2012, the date he rejected Tapco's offer of reinstatement.

## III.    Plaintiff's Claims Under The PWDCRA And His ADA Claims Against Tapco

The ADA makes it unlawful for an employer to "discriminate against a qualified individual on the basis of a disability." 42 U.S.C. § 12112(a).

An employer discriminates against an employee by taking an adverse action, such as suspension or discharge, against the employee because of his disability.

The statute also defines "discriminate" to include "not making reasonable accommodation to the known physical ... limitations of an otherwise qualified individual with a disability" unless the employer "can demonstrate that the accommodation would impose an undue hardship." *Id*. § 12112(b)(5)(A). An "otherwise qualified individual" is one who "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Id*. § 12111(8).  The Act further defines "reasonable accommodation" to include:

(A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and

(B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

*Id*. § 12111(9).

29

In this case, Plaintiff asserts claims under both the ADA and Michigan's PWDCRA.[2] Plaintiff claims that, in violation of these acts, Defendants discriminated against him based upon his disability when they: 1) terminated his employment because of his disability; and 2) failed to make a reasonable accommodation for his disability.

"[C]laims based upon an employer's failure to offer a reasonable accommodation necessarily involve direct evidence (the failure to accommodate) of discrimination." *Kleiber v. Honda of America Mfg., Inc*., 485 F.3d 862, 868 (6th Cir. 2007). The same is not necessarily true as to a disability claim premised upon an adverse action such as discharge. *Id.* at 868 n.2. For those types of claims, a plaintiff may prove that he was discriminated against based upon a disability either through direct or indirect evidence.

### A.     Standard Applicable To Failure-To-Accommodate Claim And Disability Discrimination Based On Termination Where Direct Evidence Exists

The Sixth Circuit has explained that the standard that applies in cases where the plaintiff presents direct evidence that his employer relied on his disability in making an adverse employment decision, such as termination, is as follows:

> "[I]f the plaintiff has direct evidence that the employer relied on his or her disability in making an adverse employment decision," this Court proceeds to a burden-shifting analysis. *Monette v. Elec. Data Sys. Corp*., 90 F.3d 1173, 1186 (6th Cir.1996), abrogated on other grounds by *Lewis v. Humboldt Acquisition Corp.,* 681 F.3d 312, 315–16 (6th Cir.2012) (*en banc*). First, the plaintiff must establish a prima facie case by showing "that he is disabled and otherwise qualified for the position, either with or without reasonable accommodation." *Keith v. Cnty. of Oakland*, 703 F.3d 918, 923 (6th Cir.2013).

---

[2]Michigan's PWDCRA substantially mirrors the ADA, and resolution of a plaintiff's ADA claim will generally resolve the plaintiff's PWDCRA claim." *Cotter v. Ajilon Servs., Inc.*, 287 F.3d 593, 597 (6th Cir. 2002). The Court will only address Plaintiff's PWDCRA claims where the standard differs from the ADA.

*Rorrer v. City of Stow*, __ F.3d __, 2014 WL 715782 at *9 (6th Cir. Feb. 26, 2014).

If the plaintiff carries that burden, then the defendant-employer bears the burden of proving that a challenged job criterion is essential, and therefore a business necessity, or that a proposed accommodation would impose an undue hardship on it. *Id.; Cash v. Siegel-Robert, Inc.*, __ F. App'x. __, 2014 WL 6231791 at * 4 (6th Cir. 2013).

This very same standard applies to a failure-to-accommodate claim which, as explained above, is considered a claim based on direct evidence of discrimination. *Kleiber*, 485 F.3d at 869.

### B.    Standard Applicable To Disability Discrimination Claim Based On Termination Where No Direct Evidence Exists

Where a plaintiff does not rely on direct evidence of discrimination, the familiar burden-shifting framework of *McDonnell Douglas* governs a claim of disability discrimination based upon an adverse action such as termination. *Shoemaker v. E.I. DuPont de Nemours and Co.*, 405 F. App'x. 16, 18 (6th Cir. 2010); *Rosebrough v. Buckeye Valley High Sch.,* 690 F.3d 427, 431 (6th Cir. 2012). That framework works as follows. The plaintiff must first establish a prima facie case of disability discrimination. *Shoemaker, supra*, at 18. If he satisfies that obligation, the burden shifts to the employer to offer a "legitimate nondiscriminatory" reason for its challenged action. If the employer does so, the burden shifts back to the plaintiff to establish that the employer's proffered reason is merely a pretext for unlawful discrimination. *Id.*

To establish a prima facie case of disability discrimination, a plaintiff must show that: 1) he is disabled; 2) *he is otherwise qualified for the position, with or without reasonable accommodation*; 3) he suffered an adverse employment action; 4) the employer knew or had reason to know of the plaintiff's disability; and 5) the position remained open while the

employer sought other applicants or the disabled individual was replaced.  *Whitfield v.*

*Tennessee*, 639 F.3d 253, 58-59 (6th Cir. 2011) (emphasis added).

> **C.   Here, Under Either Approach, Plaintiff Must Establish That He Was A Qualified Individual With A Disability In That He Could Perform His Job Either With Or Without A Reasonable Accommodation.**

As explained above, regardless of whether Plaintiff proceeds under the direct or indirect

evidence approach, he must establish that he was a qualified individual with a disability in that

he could perform his position either with or without a reasonable accommodation.

"The relevant time for determining whether the plaintiff is a 'qualified individual with a

disability' is at the time of discharge."  *Griffith v. Wal-Mart Store, Inc.,* 135 F.3d 376, 380 (6th

Cir. 1998); *see also Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 434 (6th

Cir. 2014).  Here, Plaintiff was discharged on November 22, 2010.

The parties do not dispute that Plaintiff is disabled or that he has unable to perform the

job without an accommodation.  Instead, the parties' dispute centers on whether Plaintiff could

have performed his job with a reasonable accommodation.

In order to survive summary judgment, it is Plaintiff's ultimate "burden to submit

evidence sufficient to create a genuine issue of material fact regarding whether he is qualified for

a position with a proposed reasonable accommodation."  *Kleiber*, 485 F.3d at 869.

Where, as here, an accommodation is necessary to enable a plaintiff to perform the

essential functions of the position in question, it is the plaintiff's initial burden to propose an

accommodation that is "objectively reasonable." *Keith v. Oakland Cty.*, 703 F.3d 918, 927 (6th

Cir. 2013) (quoting *Kleiber*, 485 F.3d at 870).

"If the employer claims [ ] that the disabled individual would be unqualified to perform

32

the essential functions of the job even with the proposed accommodation, the disabled individual must prove that he or she would in fact be qualified for the job if the employer were to adopt the proposed accommodation." " *Johnson v. Cleveland City Sch. Dist.*, 443 F. App'x. 974, 983 (6th Cir. 2011).

This Court's "analysis must focus on the limitations indicated by the doctors to determine whether [the plaintiff] was denied a necessary, reasonable accommodation." *Johnson v. Cleveland City Sch. Dist.*, 443 F. App'x. 974, 984 (6th Cir. 2011).

Here, Plaintiff asserts that he could have performed his job with the following accommodations: 1) he "should have been allowed to stay on leave without pay from TAPCO until January 2, 2011;" 2) "[u]pon returning from leave, he would have been allowed to work part-time;" and 3) "[u]pon returning from leave, he would have his 30-pound lifting restriction honored by receiving assistance with any lifting in excess of 30 pounds."  (Pl.'s. 1/21/14 Br. at 9-10).  Plaintiff proposed the part-time work accommodation for the first time during this litigation, in his Motion for Partial Summary Judgment and in his response to Defendants' Motion for Summary Judgment.  (*Id*.).

Plaintiff also contends that he actually "requested reasonable accommodations twice." (Pl.'s 1/21/14 Br. at 15).  "First, he had a note submitted by Dr. Karabajakian's office wherein Dr. Karabajakian would have the Plaintiff return to work with a 30-pound restriction on lifting." (*Id*.).

Second, Plaintiff asserts that he "requested a reasonable accommodation when he sent his letter to TAPCO's president, Jack Lawless that Plaintiff be reinstated and given leave until January 1, 2011." (*Id*. at 16).  Contrary to Plaintiff's assertion, however, his letter to Lawless did

33

not ask that he be given leave until January 1, 2011. Rather, in that letter, Plaintiff advised that

he had another procedure with respect to his heart on November 29, 2010, and "now will not be

able to return to work until my cardiologist clears me to return." (Ex. 26 to Defs.' Motion).

Plaintiff asked Tapco to consider letting him "return to work after my cardiologist clears me to

return with any possible restrictions he may require." (*Id.*). Thus, Plaintiff did not actually

propose any specific accommodations and his letter stated that, as of December 3, 2010, his

doctor had not yet cleared him to return to work or advised as to what restrictions he may have in

the future.

Nevertheless, on November 4, 2010, Dr. Karabajakian provided Tapco with a completed

Short Term Sick Pay Extension Form stating that Plaintiff could not return work until January 2,

2011. (Ex. 9 to Defs.' Br.). Thus, Defendant Tapco was aware of the proposed accommodation

of letting Plaintiff stay on unpaid leave until January 2, 2011.

### 1.      Accommodations Actually Proposed By Plaintiff

The Court shall first evaluate the accommodations that Plaintiff actually proposed to

Defendant. Again, the Court's analysis focuses on the opinions of Plaintiff's physician as to

whether he could perform the job.

### a.      Letting Plaintiff Stay On Leave, Without Pay, Until January 2, 2011

Plaintiff first contends that, as an accommodation, he "should have been allowed to stay

on leave without pay from TAPCO until January 2, 2011." (Pl.'s. 1/21/14 Br. at 9-10).

But according to Plaintiff's own physician, Dr. Karabajakian, Plaintiff was still unable to

perform the physical demands of the job by January 3, 2011. So letting Plaintiff stay on unpaid

leave until January 2, 2011, by itself, would have accomplished nothing.

**b.      Honoring Plaintiff's 30-Pound Lifting Requirement**

Plaintiff also asserts that a reasonable accommodation would be to let him stay on unpaid leave until January 2, 2011, and then upon his return honor his 30-pound lifting requirement by having others assist him when lifting things over 30 pounds.  (Pl.'s 1/21/14 Br. at 9-10).

On November 18, 2010, Dr. Karabajakian provided Tapco a written note stating that Plaintiff could return to work on November 22, 2010, and the only restricted stated was a 30 pound weight-lifting restriction.  Dr. Karabajakian testified that he does not recall why he changed Plaintiff's return to work date from January 1, 2011, to November 22, 2010.  (Dr. Karabajakian Dep. at 64-65).

Notably, in this action, Dr. Karabajakian testified that while he had the written job description for Plaintiff's job, he did not actually speak with Plaintiff about the amount of time that Plaintiff engaged in various activities at work, such as standing, walking, bending, climbing, and reaching.  (Dr. Karabajakian's Dep. at 71).

During his deposition, Dr. Karabajakian was shown the certification that Plaintiff submitted to the SSA, wherein Plaintiff stated how many hours per day he did various actions in performing his job at Tapco.  (Dr. Karabajakian's Dep. at 58-59).  Dr. Karabajakian testified that, given the standing, walking, bending, climbing, and reaching demands of Plaintiff's job, – as described by Plaintiff himself – Plaintiff has been unable to perform that job since May 23, 2010, the date he had his heart attack.

Thus, even if Tapco had allowed Plaintiff to return on January 2, 2011, and reduced Plaintiff's weight-lifting requirement to no more than 30 pounds, Plaintiff's own physician has testified that Plaintiff could not meet the other physical demands of the job.  *See e.g., Dietelbach*

*v. Ohio Edison Co.*, 1 F. App'x. 435, 437 (6th Cir. 2001) (where a plaintiff's own doctor has

concluded that he or she cannot perform the job, that plaintiff cannot establish that he or she is a

"qualified individual with a disability.").

> **2.      Part-Time Work Accommodation First Proposed During Summary
> Judgment Phase Of This Litigation – More Than Three Years After
> Plaintiff's Termination**

Plaintiff also asserts that a reasonable accommodation would be to let him stay on leave

until January 2, 2011, and then upon his return let him work part-time.  Plaintiff raised this

potential accommodation for the first time at the summary judgment phase of this litigation –

more than three years after his termination.  In raising this proposed accommodation, Plaintiff

does not identify any other restrictions he would require in his position, other than reduced hours

and a 30-pound lifting restriction.

Defendants contend that Plaintiff cannot establish that as a reasonable accommodation

for a multitude of reasons, including that: 1) Plaintiff never asked Tapco to allow him to work

part time; and 2) Plaintiff cannot establish that he could perform the job even on a part-time

basis given Dr. Karabajakian's testimony.

With respect to Plaintiff's failure-to-accommodate claim under the PWDCRA, he cannot

base that claim upon this proposed accommodation because Plaintiff never requested it in

writing.  In order to bring a cause of action under the PWDCRA "for failure to accommodate in

employment, the employee must advise the employer in writing of the need for accommodation."

*Petzold v. Borman's Inc.*, 241 Mich.App. 707, 716 (2000); MICH. COMP. LAWS § 37.1210(18)

(providing, in pertinent part, that "[a] person with a disability may allege a violation against a

person regarding a failure to accommodate under this article only if the person with a disability

*notifies the person in writing of the need for an accommodation* within 182 days after the person

with a disability knew or reasonably should have known that an accommodation was needed.")

(emphasis added).  Because Plaintiff never made a written request to Tapco for part-time work as

an accommodation, he cannot assert a claim under the PWDCRA based on that accommodation.

     With respect to his claims under the ADA, the Sixth Circuit "has determined that in order

to bring a claim for failure to accommodate under the ADA, the plaintiff has the initial burden of

requesting an accommodation."  *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042 (6th Cir.

1998); *Hammon v. D.H.L. Airways, Inc.,* 165 F.3d 441, 450 (6th Cir. 1999).  At the Sixth Circuit

explained in *Gantt*:

> There is no question that the EEOC has placed the initial burden of requesting an
> accommodation on the employee. The employer is not required to speculate as to
> the extent of the employee's disability or the employee's need or desire for an
> accommodation.

*Gantt*, 143 F.3d at 1046-47.  Here, Plaintiff never asked Tapco to allow him to work part-time.

     Indeed, the last thing that Tapco heard from Plaintiff, via his December 3, 2010 letter,

was that he had another procedure for his heart on November 29, 2010, that his doctor had still

not cleared him to return to work following that procedure, and that he may have additional

restrictions upon being cleared to work by his doctor.  "Reasonable accommodation does not

require the employer to wait indefinitely" for an employee's medical condition to improve.

*Gannt*, 143 F.3d at 1047.

     Defendants also contend that, in any event, having Plaintiff work part-time is not a

reasonable accommodation because Plaintiff has not been capable of performing the demands of

the job, even on a half-time basis, based on Dr. Karabajakian's testimony and certifications.  The

Court agrees.

For example, even as late as October 29, 2012, Dr. Karabajakian concluded that Plaintiff could "occasionally" (1-33% of the day) carry 1-10 pounds, but could "never" ((0%) of the time) carry more than 10 pounds.  (Ex. 10 to Defs.' Motion).  Dr. Karabajakian also certified that Plaintiff could sit, stand, or walk only "occasionally" (0-33% of the day) and that he could "never" climb, drive, or operate foot controls.  (*Id*.).  Thus, Dr. Karabajakian certified that Plaintiff could sit, stand, or walk no more than 2.6 hours per day.  He therefore could not even work a half-time schedule of 4 hours per day.  In addition, even during those 2.6 hours that he would be able to work, Plaintiff could "never" carry more than 10 pounds, and could never climb or drive.

Accordingly, the Court shall grant summary judgment in favor of Defendants as to Plaintiff's ADA and PWDCRA claims because Plaintiff cannot establish that he is a qualified individual with a disability who can perform his job either with or without a reasonable accommodation.

## IV.    Plaintiff's FMLA Retaliation Claim

Here, Plaintiff's FMLA claim is a retaliation claim only.  (*See* Pl.'s 1/24/14 Br. at 19). Plaintiff alleges that Defendants violated the FMLA by terminating his employment because he had taken FMLA leave and was expected to take additional FMLA leave in the future.  (Compl. at ¶ 49).

Plaintiff has no direct evidence to support his FMLA retaliation claim.

FMLA retaliation claims based on circumstantial evidence are evaluated under the *McDonnell Douglas* burden-shifting framework. *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 313-16 (6th Cir. 2001).  The plaintiff may establish a prima facie case by showing that:

38

1) he was engaged in a protected activity; 2) he suffered an adverse employment action; and 3) there was a causal connection between the adverse employment action and the protected activity. *Id.* If the plaintiff carries his burden of proof as to a prima facie case, then the burden shifts to the employer to offer a legitimate, non-discriminatory reason for the adverse action. If the employer does so, the burden shifts back to the plaintiff to show that the employer's proffered reason is a pretext for unlawful retaliation. *Id*.

A plaintiff can refute the legitimate, nondiscriminatory reason that an employer offers to justify an adverse employment action by showing that the proffered reason: 1) had no basis in fact; 2) did not actually motivate the defendant's challenged conduct; or 3) was insufficient to warrant the challenged conduct. *Hall, supra*; *Wexler v. White Fine Furniture*, 317 F.3d 564, 576 (6th Cir. 2003); *Manzer*, 29 F.3d at 1084. The first type of showing consists of evidence that the proffered bases for the termination never happened (*i.e.*, that they are factually false). With respect to the second kind of showing, "the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext, or coverup." *Id*. The third showing consists of evidence that other employees, particularly those not in the protected class, were not fired even though they engaged in similar conduct. *Id.*

Where, as here, a case is at the summary judgment stage, a plaintiff seeking to prove illegal retaliation via indirect evidence must submit sufficient evidence from which a reasonable jury could conclude that the defendant's legitimate, nondiscriminatory reasons for its actions are a pretext for unlawful retaliation. *Vincent v. Brewer*, 514 F.3d 489, 494 (6th Cir. 2007).

Here, Defendants contends that Plaintiff's FMLA retaliation claim fails because, even if

39

he could establish a prima facie case of retaliation, Plaintiff cannot show that Defendants' proffered reason for his discharge is pretextual.  Defendants contend that Plaintiff was terminated because Defendant had a good faith honest belief that Plaintiff was unable to perform his job and that he and his cardiologist were misrepresenting his true physical condition so that Plaintiff could return to work even though he could have harmed himself or others.  (Defs.' 12/31/13 Br. at 20; Defs.' Reply Br. at 6).

In responding to Defendants' Motion, Plaintiff does explain how he believes he can establish pretext.  (Pl.'s 1/24/14 Br. at 19).  All Plaintiff says as to his FMLA claim is:

> Plaintiff's FMLA claim is not premised upon entitlement to reinstatement but upon retaliation. Thus, Defendants' FMLA argument is irrelevant and the Plaintiff's FMLA claim is not subject to dismissal because of the Plaintiff's failure to work after this FMLA leave.  *Edgar v. JAC Products, Inc.*, 443 F.3d 501, 513 (6th Cir. 2006).

(Pl.'s 1/24/14 Br. at 19).

The Court concludes that Plaintiff has not met his burden as to pretext and the Court shall therefore grant summary judgment in favor of Defendants as to Count III of Plaintiff's Complaint and dismiss his FMLA claims with prejudice.

## CONCLUSION & ORDER

As explained above, IT IS ORDERED that Defendants' Motion for Summary Judgment is GRANTED IN PART AND DENIED IN PART.  The motion is DENIED in that the Court declines to rule that Plaintiff is precluded from any backpay award because he has not looked for work since his termination.  Defendants' Motion is GRANTED to the extent that the Court rules that:

1)      The individual Defendants (Brisson, Sherman, and Ulmer) are entitled to summary

judgment as to Plaintiff's ADA claims because individual supervisors who do not independently qualify under the statutory definition of employers may not be personally liable in ADA cases;

2)      Plaintiff cannot show that special circumstances existed such that he could reject Tapco's unconditional offer of reinstatement and Plaintiff would therefore be precluded from recovering backpay after June 22, 2012, if this matter were to proceed to trial;

3)      Defendant Tapco is entitled to summary judgment as to Plaintiff's ADA claims against it, and all Defendants are entitled to summary judgment as to Plaintiff's PWDCRA claims them, because Plaintiff cannot establish that he is a qualified individual with a disability who can perform his job either with or without a reasonable accommodation; and

4)      Defendants are entitled to summary judgment as to Plaintiff's FMLA retaliation claim because, in response to Defendants' properly supported Motion for Summary Judgment, Plaintiff has failed to meet his burden as to pretext.

IT IS FURTHER ORDERED that Plaintiff's Motion for Partial Summary Judgment is DENIED.

S/Sean F. Cox_____
Sean F. Cox
United States District Judge

Dated:  July 10, 2014

I hereby certify that a copy of the foregoing document was served upon counsel of record on July 10, 2014, by electronic and/or ordinary mail.

S/Jennifer McCoy_____
Case Manager